# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| JARED L. MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) CAUSE NO. 1:11-cv-161-DKL-WTL |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration , | ) |
| | ) |
| Defendant. | ) |

## ENTRY

Plaintiff Jared L. Mitchell ("Mr. Mitchell") requests judicial review of the decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("SSA"), denying Mr. Mitchell's application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act.[1] For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

### A.    Procedural History

Mr. Mitchell applied for SSI benefits through the SSA on July 10, 2006. [Doc. 1 at 2.] The claim was initially denied on September 18, 2006, and reconsideration was subsequently denied on February 12, 2007. [Doc. 14-2 at 14; Doc. 14-3 at 3.] Mr. Mitchell

---

[1]SSI is available for uninsured individuals who meet income and resources criteria. 42 U.S.C. §1381, *et seq.*

next requested an administrative hearing, which took place on April 30, 2009, before Administrative Law Judge ("ALJ") Stephen E. Davis. [Doc. 14-2 at 21.] On June 26, 2006, the ALJ denied Mr. Mitchell's claim, and the SSA Appeals Council affirmed the ALJ's order on December 6, 2010. [Doc. 1 at 2, Doc. 14-2 at 2-4, 21.] On February 2, 2011 Mr. Mitchell timely filed the instant action requesting judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). [Doc. 1 at 1.] The parties have consented to the Magistrate Judge conducting proceedings and ordering the entry of judgment in this case in accordance with 28 U.S.C. §636( c) and Fed. R. Civ. P. 73. [Doc. 12; Doc. 18.]

**B.     Mr. Mitchell's Personal History**

Mr. Mitchell was born on July 12, 1975. [Doc. 14-2 at 19.] Mr. Mitchell graduated from high school in 1995, and attended some classes at Ivy Tech Community College. [Doc. 14-2 at 30; Doc. 14-6 at 11.] At some point, Mr. Mitchell married Etoria Renay Mitchell, and they have a five-year-old child.[2] [Doc. 14-2 at 25; Doc. 14-5 at 3.] Mr. Mitchell worked at Today's Bedroom One as a furniture deliveryman, furniture restorer, and forklift driver for three or four years until June 2, 2006. [Doc. 14-2 at 23, 25-26.]

**C.     Medical Treatment History**

On June 2, 2006, Mr. Mitchell sustained a gunshot wound on his left thigh. [Doc. 14-2 at 23; Doc. 14-7 at 21.] Mr. Mitchell received treatment at the Wishard Hospital emergency room. An x-ray displayed "large metallic fragments seen posterior laterally to

---

[2] The record does not provide the child's age; however, Mr. Mitchell testified that his child was three years old at the April 30, 2009 hearing. [Doc. 14-2 at 25.]

the distal femur." [Doc. 14-6 at 56.] There was no evidence of any fractures or vascular abnormality at that time. [Doc. 14-7 at 12.] The radiology report provided: "Ossesous [bone] structures are intact. No fractures. No bony destruction. Hip joints unremarkable." [Doc. 14-7 at 5-6.]

Following the incident, Mr. Mitchell reported problems with his left foot, and it was determined that the gunshot wound caused nerve damage resulting in "foot drop." [Doc. 14-6 at 7, 57.] "Foot drop" is "[t]he condition in which the patient is unable to bend the foot upward, toward the shin, usually because of paralysis of the muscles involved, as the tibialis anterior, peroneus tertius, and extensor digitorum langus." Vol. 2-Ch-F,, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at F-148.

On September 11, 2006, Dr. Anas F. Safadi conducted a medical evaluation of Mr. Mitchell for the SSA. [Doc. 14-6 at 57.] Dr. Safadi found that Mr. Mitchell's posture was normal, but his gait was slightly imbalanced due to left foot drop and weakness in his left knee and left foot. [Doc. 14-7 at 22.] Mr. Mitchell reported to Dr. Safadi that he was not able to walk more than one block or stand more than five minutes without significant pain. [Doc. 14-7 at 21.] Dr. Safadi opined that Mr. Mitchell's quality of life has been severely affected by the injury. [Doc. 14-7 at 23.]

On September 14, 2006, Mr. Mitchell underwent a Residual Functional Capacity (RFC) assessment. [Doc. 14-7 at 25, 32.] The RFC provided that Mr. Mitchell could occasionally lift or carry 20 pounds, and that he could frequently lift or carry 10 pounds. [Doc. 14-7 at 26.] The RFC also provided that Mr. Mitchell could stand/walk and sit for six

hours in an eight-hour workday. [Doc. 14-7 at 26.] However, the RFC provided that Mr. Mitchell's ability to "[p]ush and/or pull (including operation of hand and/or foot controls)" was "limited in lower extremities." [Doc. 14-7 at 26.] With respect to postural limitations, the RFC provided that Mr. Mitchell could occasionally climb ramp/stairs, balance, stop, kneel, crouch, and crawl. [Doc. 14-7 at 26.] The RFC indicated that Mr. Mitchell should never climb ladder/rope/scaffolds. [Doc. 14-7 at 26.] The RFC stated that Mr. Mitchell had no manipulative, visual, communicative, or environmental limitations. [Doc. 14-7 at 28-29.]

On September 18, 2006, the SSA denied Mr. Mitchell's request for SSI benefits, determining that he was not disabled. [Doc. 14-3 at 2.] A state agency reviewing physician, Dr. Jonathan Sands, performed an examination of Mr. Mitchell in connection with the above determination. [Doc. 14-3 at 2.] Dr. Sands provided a primary diagnosis of "other disorders of the nervous system," and a secondary diagnosis of "disorders of muscle, ligament and fascia." [Doc. 14-2 at 2]. Dr. Sands determined that Mr. Mitchell was not disabled. [Doc. 14-2 at 2.]

A treatment note from October 2006 indicates that Mr. Mitchell's presented to the emergency room requesting Vicodin pain medications. The attending physician indicates in the record that Mr. Mitchell's leg was well healed from the gunshot wound in June 2006. The physician's diagnostic impression was that Mr. Mitchell was engaging in drug seeking behavior. The physician prescribed Neurotin and Mr. Mitchell was discharged for home in good condition. [Doc. 14-7 at 33-35.]

On January 30, 2007, Dr. Angela Marshall conducted a psychiatric evaluation of Mr. Mitchell for the SSA.  [Doc. 14-7 at 51.]  Dr. Marshall noted that Mr. Mitchell was referred to evaluate his disability claim related to a gunshot wound resulting in nerve damage to his leg, as well as depression and anxiety.  [Doc. 14-7 at 53.]  Dr. Marshall evaluated Mr. Mitchell in accordance with the DSM-IV-TR.  [Doc. 14-7 at 53.]  She found that he exhibited post-traumatic stress disorder.  [Doc. 14-7 at 53.]  Dr. Marshall estimated Mr. Mitchell's global assessment of functioning (GAF) at 58 [Doc. 14-7 at 53.], or "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR, American Psychiatric Association, 34.  Dr. Marshall opined that "it does not appear as if psychological factors are significantly and adversely affecting his ability to maintain gainful employment."  [Doc. 14-7 at 53.]

On February 9, 2007, Dr. J. Gange conducted another psychiatric review.  [Doc. 14-7 at 1, 37.]  Dr. Gange gave weight to Dr. Marshall's assessment.  [Doc. 14-7 at 49.]  Dr. Gange found that Mr. Mitchell exhibited affective and anxiety-related disorders.  [Doc. 14-7 at 37.]  With respect to affective disorder, Dr. Gange found that Mr. Mitchell displayed adjustment disorder with depressed mood.  [Doc. 14-7 at 40.]  With respect to anxiety-related disorder, Dr. Gange found that Mr. Mitchell had recurrent and intrusive recollections of a traumatic experience, which were a source of marked distress.  [Doc. 14-7 at 42.]  Notably, Dr. Gange concluded that the anxiety-related disorder was not evidence of organic mental, psychotic, or affective disorders.  [Doc. 14-7 at 48.]  Ultimately, Dr. Gange opined that Mr. Mitchell

had no severe mental health impairments, and that his "functioning does not appear to be limited by severe psych impairment." [Doc. 14-7 at 37, 49.] Dr. Gange observed that Mr. Mitchell had functional limitations, but they were related to the physical symptoms from the gunshot wound. [Doc. 14-7 at 49.]

On February 12, 2007, the SSA rejected Mr. Mitchell's request for reconsideration, again concluding that Mr. Mitchell was not entitled to SSI benefits because he was not disabled. [Doc. 14-3 at 3.] Before the reconsideration determination, another state agency reviewing physician, Dr. Bruce Whitley, conducted an examination of Mr. Mitchell. [Doc. 14-3 at 3.] Dr. Whitley provided a primary diagnosis of left foot drop resulting from a gunshot wound, and a secondary diagnosis of anxiety related disorders. [Doc. 14-3 at 3.] Dr. Whitley also determined that Mr. Mitchell was not disabled. [Doc. 14-3 at 3.] Mr. Mitchell next requested a hearing before an ALJ on this matter. [Doc. 14-2 at 14; Doc. 14-4 at 14.]

On August 12, 2007, Mr. Mitchell reported to the psychiatric emergency room at Wishard Hospital. [Doc. 14-7 at 54.] Apparently, Mr. Mitchell and his wife were having marital issues, and she called the police for unspecified reasons. [Doc. 14-7 at 54.] Mr. Mitchell denied any mental health issues, specifically he denied depressive symptoms. [Doc. 14-7 at 54.] The hospital staff contacted Mr. Mitchell's long time roommate, who stated that Mr. Mitchell did not appear to be depressed or suicidal. [Doc. 14-7 at 54.] The hospital staff estimated Mr. Mitchell's GAF at 61 [Doc. 14-7 at 54], or "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or

school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." [DSM-IV-TR, American Psychiatric Association, 34. ]

## D. The Administrative Hearing

The administrative hearing took place on April 30, 2009. [Doc. 14-2 at 21.] Mr. Mitchell testified at the hearing, and no expert witnesses were presented. Mr. Mitchell's testimony consisted of the following in pertinent part.

After the June 2, 2006 shooting incident injuring his leg, Mr. Mitchell complained of pain in his leg and left ankle and that he could not stand or walk for long periods of time. [Doc. 14-2 at 26-28.] Mr. Mitchell has not worked since the day he was shot. He testified that he is currently serving a 25 year sentence for possession and dealing cocaine. [Doc. 14-2 at 23.] Mr. Mitchell testified that he could walk one-quarter to one-half of a block before needing to rest. [Doc. 14-2 at 28.] He indicated that he could walk further – at least a half block more with the brace on, but that he no longer used the brace because it was too painful to wear. [Doc. 14-2 at 27-28.] Mr. Mitchell testified that his ability to lift is limited to no more than 10-15 pounds because more weight throws his balance off. Additionally, Mr. Mitchell testified that he could stand only 15 to 20 minutes before needing to rest. [Doc. 14-2 at 28.] Mr. Mitchell testified that he does not take any kind of pain medicine and had not had since his prior job's health benefits were cut off. [Doc. 14-2 at 29.] Mr. Mitchell testified that he could not return to his job at Today's Bedroom One, because he was unable to perform the duties of that physically demanding job. [Doc. 14-2

at 26.] Mr. Mitchell explained that he could not sit for long periods of time without experiencing numbness, and that his sleep was interrupted due to leg and foot discomfort. [Doc. 14-2 at 29-30.] When the ALJ asked Mr. Mitchell if he could do a job mostly sitting all day he replied:

> That seems to be the route that I think that I'm going to have to take when I try to find a job. But at the same, you know, as far as sitting, I would still have to get up and move around, try to, just try to move my leg, [...] constantly because of the numbness that I get. But I think that's part of the best, you know, the best thing for me to do as far as trying to, if I do try the time to find work, whenever I'm able to try to find a job again.

[Doc. 14-2 at 28.]

## II. LEGAL STANDARDS

### A.    Standard for Proving Disability

To qualify for disability benefits, Mr. Mitchell must be found "disabled" under the Social Security Act. 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" in pertinent part as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations, 20 C.F.R. §§ 404.1520, 416.920, prescribe a sequential five-part test to determine whether a claimant was disabled, wherein the ALJ must consider whether the claimant: "(1) is engaging in substantial gainful activity; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals any impairment listed in the regulations as being so

severe as to preclude substantial gainful activity; (4) has a residual functional capacity that leaves him unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy." *Taylor v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005). "A finding of disability requires an affirmative answer at either step three or step five." *Id.* at 352. Mr. Mitchell has the burden of proof for the first four steps while the Commissioner bears the burden for the fifth step. *Id.*

**B.     Standard for Judicial Review**

Judicial review of the ALJ's factual findings is deferential. A Court must uphold the ALJ's decision so long as the ALJ applied the correct legal standard, and substantial evidence supported the decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The standard requires more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). The ALJ is not required to evaluate, in the written decision, every piece of testimony and evidence in the record. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the ALJ's decision "must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

# III. DISCUSSION

## A.    The ALJ Findings

The ALJ denied Mr. Mitchell's request for SSI.  [Doc. at 14-21.]  In reaching this conclusion, the ALJ made the following key findings in accordance with the five-part test to determine whether a claimant was disabled.  At step one, the ALJ found that Mr. Mitchell had not engaged in substantial gainful activity since his application for benefits date of July 10, 2006.  [Doc. 14-2 at 16.]  At step two, the ALJ found that the residual effects of the gunshot wound created a severe impairment; however, he determined that Mr. Mitchell's mental impairment was not severe.  [Doc. 14-2 at 16.]  At the third step, although the ALJ determined that the residual effects of Mr. Mitchell's gunshot wound presented some limitations; he found that "all of the criteria of any section in category 1.01 for musculoskeletal impairments are not demonstrated by the evidence of record."  [Doc. 14-2 at 17.]  The ALJ found that Mr. Mitchell has "the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 416.967(a)."  [Doc. 14-2 at 17.]  At the fourth step, the ALJ determined that although Mr. Mitchell could not return to his former, physically demanding position, he was capable of performing a full range of sedentary work.  [Doc. 14-2 at 19.]  Ultimately, the ALJ found that Mr. Mitchell was not disabled after considering the RFC, his age, education, and work experience.  [Doc. 14-2 at 20.]

**B.** **Mr. Mitchell's Arguments** Mr. Mitchell argues the following points on appeal: (1) the ALJ erred in finding that Mr. Mitchell did not meet or equal listing 1.02A; (2) the ALJ erred in his credibility determination; and (3) the ALJ failed to make the appropriate step -five determination. Each of Mr. Mitchell's arguments are addressed below.

**1.** **The ALJ's determination that Mr. Mitchell did not meet or equal Listing 1.02A was supported by substantial evidence**

Mr. Mitchell argues that his impairment met or exceeded listing 1.02A.[3] Specifically, Mr. Mitchell contends that the decision must be reversed because of the ALJ's failure to summon a medical advisor and that substantial evidence fails to support the Step 3 denial.[4] The Court disagrees.

**a.** **The ALJ's failure to summon a medical advisor was not error.**

Mr. Mitchell criticized the ALJ for failing to call a medical advisor at the hearing to testify whether his impairment met or was equal to a listing. Mr. Mitchell argues that the

---

[3]Mr. Mitchell nominally referenced post-traumatic stress disorder and depression to bolster his disability claim. However, he made no argument with respect to any mental health impairments. Dr. Marshall opined that "it does not appear as if psychological factors are significantly and adversely affecting his ability to maintain gainful employment." [Doc. 14-7 at 53.] Additionally, Dr. Gange opined that Mr. Mitchell had no severe mental health impairments, and that his "functioning does not appear to be limited by severe psych impairment." [Doc. 14-7 at 37, 49.] Ultimately, there was no record evidence that Mr. Mitchell was adversely affected by severe mental health impairments as set forth in category 12.01 of 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[4]Mr. Mitchell also generally complained that the ALJ's decision warranted reversal because it was "unfair and unjust." [Doc. 17 at 10.] The Court finds this argument undeveloped.

without a medical expert testifying at the hearing the ALJ's step three findings were based on a layman's opinion. [Doc. 17 at 11.]

First, there is nothing in the regulations that require the ALJ to solicit the opinion of a medical expert; the decision to use a medical expert is entirely discretionary. See 20 C.F.R. 416.927(f)(2)(iii). "If the ALJ believes that he lacks sufficient evidence to make a decision, he must adequately develop the record and, if necessary, obtain expert opinions." *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir. 2000).

Second, the regulations further provide that the ALJ is to consider the opinions of a medical consultant designated by the Commissioner when determining whether an impairment was equivalent to a listing. 20 C.F.R. §§ 404.1526(c). In this case, two state agency physicians determined that Mr. Mitchell was not disabled. [Doc. 14-3 at 2-3.] As a result, two Disability Determination and Transmittal Forms were completed indicating that Mr. Mitchell was not disabled based on medical evaluations. [Doc. 14-3 at 2-3.] Importantly, none of the physicians indicated that Mr. Mitchell's impairment met or was equal to listing 1.02A. The physicians expressed no concerns over Mr. Mitchell's ability to ambulate effectively.

It is true that the "ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett*, 381 F.3d at 669. However, completion of the Form SSA-831 is conclusive proof that a physician has considered the equivalency of a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The regulations also provide that the ALJ may rely on the medical determinations of a state

agency physician on the question whether a claimant's impairments meet or equal a listing. SSR 86-8, 1986 WL 68636, at *4 (1985). In this instance the record contained various medical reports, medical evaluations, and assessments. The ALJ aptly recognized that the evidence of record did not satisfy "all of the criteria of any section in category 1.01 for musculoskeletal impairments." [Doc. 14-2 at 17.] Therefore, the Court finds that the ALJ did not err in failing to call a medical advisor to testify, where the record contained sufficient evidence to determine whether Mr. Mitchell was disabled and the step three finding was supported by substantial evidence. See *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).

### b. The ALJ's determination is supported by substantial evidence.

Alternatively, Mr. Mitchell contends that the ALJ's decision should be reversed because the he rejected treatment-examination evidence proving that Mr. Mitchell's combined impairments met or medically equaled Listing 1.02A. Mr. Mitchell bears the burden to demonstrate medical evidence that matched or equaled all of the criteria specified by a listing. *Ribaudo*, 458 F.3d at 582.

The regulations provide that a claimant will be deemed disabled at step three only if he has a condition with symptoms that meet or equal the criteria of one or more of the listed impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404 Subpt. P, App. 1. Even where a claimant's symptoms do not correspond exactly with a listing's requirements, one may still be deemed disabled if medical evidence demonstrates that one's symptoms were equal in severity and duration to those of a listed impairment. 20 C.F.R. § 404.1526(a) and (b).

Listing 1.02 provided that a major dysfunction of a joint can constitute a disability. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Such dysfunction has four requirements. First, Mr. Mitchell must have a gross anatomical deformity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Second, Mr. Mitchell must have chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint or joints. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Third, Mr. Mitchell must produce findings of joint space narrowing, bony destruction, or ankylosis of the affected joint or joints. 20 C.F.R. Pt. 404, Subpt. P, § 1.02. Finally, Mr. Mitchell must show that the dysfunction involved "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A.

The regulations provides this instructive definition:

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1). The regulations further provide some non-exclusive examples of ineffective ambulation: "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability

to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(2).

The ALJ determined: "The residuals of the claimant's gunshot wound present some limitations, as a result of his left foot drop. However all of the criteria of any section in category 1.01 for musculoskeletal impairments are not demonstrated by the evidence of record." [Doc. 14-2 at 17.] Mr. Mitchell did not met his burden establishing that he met the listing of 1.02A where there was no record evidence that he suffered from the "inability to ambulate effectively" as defined by the regulation. A determination that Mr. Mitchell did not suffer from the "inability to ambulate effectively" is implicit in the ALJ's decision stating that "all of the criteria of any section in category 1.01 for musculoskeletal impairments are not demonstrated" and this finding is supported by the record.

As pointed out by the Commissioner "the record does not reflect that Mr. Mitchell has ever required canes, crutches, or walkers that limited the functioning of both of his arms in order to ambulate." [Doc. 24 at 9.] Dr. Safadi specifically reported that Mr. Mitchell did not require the use of an assistive device in order to ambulate. [Doc. 14-7 at 21.] The RFC also provided that Mr. Mitchell did not use assistance devices. [Doc. 14-7 at 26.] At the hearing, Mr. Mitchell testified that he did not use a crane or crutches, and that he did not use a brace, because the one he was issued caused some discomfort. [Doc. 14-2 at 28.] Moreover, Mr. Mitchell admitted that he could walk longer distances with the brace, i.e. one block as opposed to one-quarter or one-half block. [Doc. 14-2 at 28.] Mr. Mitchell's wife submitted a disability assessment during the proceedings, and she indicated that Mr.

Mitchell had limited mobility; however, she also indicated that he went outside everyday, could drive an automobile, and left their residence by himself. [Doc. 14-6 at 46, 48.]

The medical report following the June 2, 2006 shooting provided that fragments were present in Mr. Mitchell's left leg; however, there was no evidence of any fractures, bony destruction, or vascular abnormality at that time. [Doc. 14-6 at 56; Doc. 14-7 at 5-6, 12.] The record also documented that the gunshot wound caused nerve damage resulting in foot drop. [Doc. 14-6 at 7, 57.] Mr. Mitchell complained that he could not stand or walk for long periods of time without experiencing pain, or sit for prolonged periods without experiencing numbness. [Doc. 14-2 at 26-30; Doc. 14-6 at 7.] The two state agency physicians determined that Mr. Mitchell was not disabled. [Doc. 14-3 at 2-3.] Dr. Sands provided that Mr. Mitchell's primary diagnosis was "other disorders of the nervous system," while Dr. Whitley expressly diagnosed Mr. Mitchell with foot drop. [Doc. 14-3 at 2-3.] Dr. Safadi found that Mr. Mitchell "had no evidence of joint effusion [swelling] or tenderness." [Doc. 14-7 at 22.] While Mr. Mitchell "showed impairment in his left knee due to knee weakness and his left ankle both on dorsiflexion and plantarflexion," Dr. Safadi noted no other abnormalities. [Doc. 14-7 at 22-23.] Dr. Safadi did not express an opinion whether Mr. Mitchell was disabled; however, he opined that Mr. Mitchell's quality of life has been severely affected by the injury, and that it warranted further attention. [Doc. 14-7 at 23.] The RFC provided that Mr. Mitchell's physical limitations were not as pronounced as reported by Mr. Mitchell, where he could occasionally lift or carry 20 pounds, and that he could frequently lift or carry 10 pounds. [Doc. 14-7 at 26.] The RFC

also provided that Mr. Mitchell could stand/walk and sit for six hours in an eight-hour workday. [Doc. 14-7 at 26.]

Mr. Mitchell did not carry his burden to demonstrate that his impairment met or equated "with any impairment listed in the regulations as being so severe as to preclude substantial gainful activity." *Taylor*, 425 F.3d at 351-352. Mr. Mitchell complained that the ALJ ignored medical reports from June 2006, as well as ignoring Dr. Safadi's findings that Mr. Mitchell experienced constant numbness and pain. However, none of these reports have any bearing on Mr. Mitchell's ability to *ambulate effectively* as defined by the regulations. Although Dr. Safadi noted that "the patient's quality of life has been severely affected" it was also noted that he could walk up to a block. [Doc. 14-7 at 21.] There is nothing in Dr. Safadi's report indicating that Mr. Mitchell's was unable to *ambulate effectively* under the regulations. There was no indication that any of Mr. Mitchell's treating or examining physicians indicating that Mr. Mitchell required the type of assisted devices cited in the regulations in order to ambulate. The ALJ's step three determination is succinct but it is nonetheless supported by the record. With respect to step three, the ALJ applied the correct legal standard, and substantial evidence supported the decision. *Barnett*, 381 F.3d at 668.

2.    **The ALJ's credibility determination has support.**

Mr. Mitchell also takes issue with the ALJ's credibility determinations. "In evaluating the credibility of statements supporting a Social Security application . . . an ALJ must comply with the requirements of Social Security Ruling 96-7p." *Brindisi ex rel. Brindisi*

*v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). The ALJ should consider the following factors in making a credibility determination: (1) the objective medical evidence; (2) daily living activities; (3) the location, duration, frequency, and intensity of pain and other symptoms; (4) precipitating and aggravating factors; (5) medications taken; (6) treatment; (7) other measures taken to relieve symptoms; (8) any other factors concerning Mr. Mitchell's functional limitations and restrictions. See SSR 96-7p. Because is in the best position to determine the credibility of a claimant, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), and credibility determinations will be disturbed only if it is unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ's decision reflected that he considered the factors above in making a credibility determination. [Doc. 14-2 at 17-19.] The ALJ found that Mr. Mitchell's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [Doc. 14-2 at 18.] The RFC undermined Mr. Mitchell's testimony regarding his functional capacity. There was no indication that the ALJ ignored Mr. Mitchell's present physical limitations. Indeed, the ALJ acknowledged that Mr. Mitchell "has limitations in walking and standing due to left foot drop in the left leg." [Doc. 14-2 at 16.]

The ALJ stated that he did not credit Mr. Mitchell's testimony due to his criminal background and the lack of supporting evidence from any treating source. [Doc. 14-2 at 19.] Mr. Mitchell testified at the hearing that he was currently serving a 25 year sentence.

A criminal conviction that is punishable by death or imprisonment in excess of one year, is evidence that may be used to discredit an individual's credibility. Fed. R. Evid. 609(a)(1); *Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). However, a fair reading of the ALJ's decision indicates that the ALJ based his credibility determination on the unsupported nature of Mr. Mitchell's testimony and not solely on his criminal conviction. *Vreeland v. Astrue,* Case No. 06-C-466-C, 2007 WL 5414923, at *13 (W.D. Wis. Mar. 27, 2007)(when considering credibility it is not improper for the ALJ to consider criminal convictions as "part of the totality of circumstances.")

Here, the ALJ considered the lack of corroborating medical evidence against the backdrop of Mr. Mitchell's criminal history. The ALJ noted the lack of supporting evidence from any treating source. Indeed, the ALJ found "very little evidence of any medical treatment or, in fact, any continuing treatment". Moreover, despite being incarcerated since June 2008, there is no evidence that Mr. Mitchell sought or received any continuing treatment for his drop foot since after October 2006. This lack of supporting medical evidence coupled with Mr. Mitchell's criminal conviction supports the ALJ's adverse determination concerning Mr. Mitchell's credibility. Consequently, the Court finds that the ALJ's credibility determination has adequate support in the record and does not warrant reversal.

**3.    The ALJ made an appropriate step-five determination.**

Mr. Mitchell claims that substantial evidence did not support the ALJ's step-five determination that he was not disabled because he could perform some sedentary level jobs.  With respect to step five, 42 U.S.C. § 423(d)(2)(A) provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

The ALJ determined that Mr. Mitchell can no longer perform the duties of his former position, which was physically demanding.  [Doc. 14-2 at 19.]  Mr. Mitchell's testimony suggested that he would be able to obtain some sort of clerical position:  "That seems to be the route that I think that I'm going to have to take when I try to find a job."  [Doc. 14-2 at 29.]  The ALJ concluded:  "Based on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.27."  [Doc. 14-2 at 20.]

The ALJ's step-five analysis relied on the grids or the Medical-Vocational Guidelines, which contained tables that correlate Mr. Mitchell's age, work experience,

education, and residual functional capacity with predetermined findings of disabled or not disabled. 20 C.F.R. §§ 404.1569 and 1569a. "The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools." SSR 96-9p. "Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." SSR 96-9p. The RFC established that Mr. Mitchell could perform sedentary work. [Doc. 14-7 at 26, 28-29.] Mr. Mitchell essentially complained that it was not appropriate to use the grids due to his non-exertional limitations. "Nonexertional capacity considers any work-related limitations and restrictions that are not exertional." SSR 96-9p. "[A] nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling." SSR 96-9p. "Environmental restrictions are also considered to be nonexertional." SSR 96-9p. Based on the RFC there were no nonexertional limitations on Mr. Mitchell other than climbing a ladder, rope, or scaffold. [Doc. 14-7 at 26, 28-29.] Contrary to Mr. Mitchell's assertion, the ALJ appropriately used the grids, and he did not need to call on a vocational expert, because non-exertional limitations had no significant impact on Mr. Mitchell's ability to perform the full range of sedentary work. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). The Court

concludes that the ALJ made an appropriate stage-five determination and reversal is not warranted.

## IV.  CONCLUSION

For the reasons stated above, the Court **AFFIRMS** the decision.

Dated:  03/30/2012

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distributed to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com